COJOCARI *v.* HIGHLAND PARK GINGER ALE CO.

MASTER AND SERVANT—FAMILY CORPORATION—CONTRACT FOR SERV-
ICES—QUESTION FOR JURY—EVIDENCE—DAMAGES.
In action of assumpsit to recover wages or compensation for
services rendered defendant corporation for period of over
eight years and a half during which time plaintiff was the
wife of a member of the family which owned and conducted
the operations of defendant, evidence *held,* to have been suf-
ficient to present to jury the question as to whether plaintiff's
services were rendered under such circumstances as to require
defendant to pay for same and to enable them to determine
amount due therefor without resorting to conjecture or specu-
lation.

Appeal from Wayne; Spier (James E.), J., pre-
siding. Submitted April 10, 1942. (Docket No. 3,
Calendar No. 41,818.) Decided May 18, 1942.

Assumpsit by Sylvia Cojocari against Highland
Park Ginger Ale Company, a Michigan corporation,
for wages for services performed. Verdict and judg-
ment for plaintiff. Defendant appeals. Affirmed.

*Paul Bairas,* for plaintiff.

*David B. Lichtig* (*Herman J. Bloom,* of counsel),
for defendant.

NORTH, J.   Sylvia Cojocari, formerly Sylvia Bobb,
brought this suit in assumpsit to recover wages or
compensation for services which she claims she ren-
dered to the defendant corporation between Febru-
ary 1, 1932, and October 15, 1938. The defense urged
was that the corporate enterprise was an undertak-
ing of the Bobb family and that plaintiff, who was

the wife of Louis Bobb during all the period of the alleged employment, merely rendered intermittent and gratuitous services without expectation of pay, and that such services were not rendered under either an express or implied contract to pay plaintiff therefor. The total of plaintiff's asserted claim was $4,965. Upon trial, by jury, she had a verdict for $2,704, and judgment was rendered thereon. Defendant has appealed, and contends that plaintiff did not establish either an express or an implied contract, and that she had no "arrangement" for compensation with any authorized agent of the corporation, and that there was no definite proof of employment, or of the extent of services rendered, or of the rate or amount to be paid to plaintiff; and hence the verdict of the jury was "based upon conjecture and speculation."

Plaintiff married Louis Bobb in January, 1932. While Louis Bobb was not a stockholder in defendant corporation, other members of his family held all of the stock in the company, and Louis worked for it in the manufacture, sale and distribution of ginger ale. He was paid for services so rendered. During practically all of the period of the alleged employment of plaintiff her husband's brother, Frank Bobb, was president of the defendant corporation, and together with his mother, Florence Bobb, managed its business. She held one-half of the corporation's stock and was its secretary-treasurer. Plaintiff separated from her husband in 1938, and was divorced from him in October, 1939. Incident to the divorce proceedings plaintiff received $1,400 as alimony and in settlement of her property rights. At that time no claim seems to have been made that the corporation was indebted to plaintiff. She testified in the instant case that the attorney who represented her in the divorce case "didn't want to handle this case." But in the present case defendant points

out that Sylvia Cojocari in her cross bill in the divorce proceedings alleged that: "ever since the marriage of said parties this defendant was required to do not only her housework and perform her duties in respect to the home, but also to work in the plant, and that said work in the plant was done without any compensation or appreciation."

During all of the period of the alleged employment plaintiff and her husband occupied a part of a dwelling in the immediate vicinity of defendant's plant, and another portion of this same dwelling was occupied by the parents of plaintiff's husband, and still another portion by Frank Bobb and his wife. All of these parties ate at the same table, and practically all of the general expenses of maintaining this household were borne by the parents of plaintiff's husband. Plaintiff, her mother-in-law, and her sister-in-law, all participated in the discharge of the household duties; and each of them also did more or less work in the defendant's plant. As to plaintiff's activities in the place of business she testified:

"When I started to work steady I used to wash bottles, stack cases, would help to load the truck, take care of the office, answer the phone, take care of the daily receipts which the drivers brought in and check the drivers in and waited on customers. I did mostly everything around there. To the best of my recollection I put in between 10 and 15 hours a day during the summer months. That was when they were busy. In the winter I don't believe I put in more than from six to eight hours. I would go home and do some of my work and when the deliveries came in with more dirty bottles I would go back to the shop and wash again. Then maybe I would have an hour or two in between times."

As to there having been some actual hiring of plaintiff she testified, in response to a question as to whether she talked with Frank Bobb with reference

to being paid, that she had some talk with him, and that she also talked with his mother "because she was really the head boss;" and that Mrs. Florence Bobb told plaintiff, in substance, that defendant could not pay her at the time because business was not very good. In this connection plaintiff testified:

"She told me that I should work, and she would pay me. I wouldn't work for nothing. I knew that nobody works for nothing. * * * I was supposed to have earned the same as one of those other employees, I knew I wasn't working for my husband. My ex-mother-in-law told me."

Plaintiff further testified that upon speaking to Frank Bobb about her compensation he told her "he would have to see his mother;" and further that during the summer months, the employees doing the same kind of work the plaintiff did received $15 a week, but in the winter season the pay varied according to the amount of business. It also appears from plaintiff's testimony that soon after she started working:

"They (Florence and Frank Bobb) told me they wouldn't, couldn't pay me then, business wasn't very good, which it wasn't, and they told me to wait until the summer, that the sum would accumulate and I would be paid in a lump sum. * * *

"She (Florence Bobb) told me she couldn't pay me then because business wasn't very good, that I shouldn't worry, and that I would be paid when business got better in a lump sum. She told me some day I would be glad I waited instead of being paid weekly because then I could see the money. * * * I never got paid for my work."

On cross-examination plaintiff gave the following testimony:

"Q. Did Frank ever employ you?
"A. Well, he told me to go to work.

"*Q.* He never promised to pay you any money?

"*A.* Yes, he did, one time when he wasn't feeling bad. That was right after I started to work. * * *

"Right after I got married in 1932 Mrs. Bobb and Frank hired me to work in the plant. I spoke with Frank about it several times."

As to the extent and regularity of plaintiff's services, upon cross-examination, she testified:

"*Q.* Did you keep any record of the days, weeks and months that you worked there?

"*A.* No, not to write it down, no. Well, I know I worked there all the time.

"*Q.* Now, after you had worked there for a year and had not received any wages, why didn't you start to keep a record of them?

"*A.* Well, I trusted them.

"*Q.* In 1934, after you asked them to pay you your wages and they didn't why didn't you keep a record of them?

"*A.* Well, I trusted them. I didn't think it was necessary.

"*Q.* And you haven't any idea of the exact days and exact time that you put in?

"*A.* Well, to tell the truth, I know I worked there the greatest part of the time. * * * During the summer months I would go home during the day and stay an hour, some times not even that long. During June, July and August, I bet that I didn't go home more than twice a day."

Plaintiff's testimony was corroborated by that of other witnesses who had an opportunity to observe the character and extent of services rendered by her and who seemed to be disinterested in the outcome of this litigation. On the other hand her testimony was squarely contradicted on the phase of express employment by Mrs. Florence Bobb and Frank Bobb; and they and other witnesses gave testimony which tended very materially to minimize both the extent

and the character of plaintiff's alleged services and also tended to sustain defendant's contention that plaintiff's services were rendered as a member of the Bobb family and without any express or implied agreement to pay therefor or any apparent expectation on the part of plaintiff to receive compensation.

Our review of this record satisfies us that there was presented for the jury's determination an issue of fact as to whether plaintiff's services were rendered under such circumstances as legally obligated defendant to pay for the same and also that there was sufficient testimony to enable the jury to determine the amount due plaintiff therefor without basing such determination on mere conjecture or speculation.

The judgment in the circuit court is affirmed, with costs to appellee.

CHANDLER, C. J., and BOYLES, STARR, WIEST, BUTZEL, BUSHNELL, and SHARPE, JJ., concurred.